# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ROBERT PHONEPRASITH,

                Plaintiff,

v.

BRIAN GREFF, TAMMY DEVRIES,
and MICHAEL BERNSTEIN,

                Defendants.

Case No. 19-CV-456-JPS

**ORDER**

    Plaintiff Robert Phoneprasith, a prisoner proceeding in this matter *pro se*, filed a complaint alleging that Defendants violated his constitutional rights. (Docket #1). On August 21, 2019, the Court screened the complaint and allowed Plaintiff to proceed on a claim of retaliation in violation of the First Amendment against Defendants Michael Bernstein, Tammy DeVries, and Brian Greff. (Docket #10).

    On June 15, 2020, Defendants filed a motion for summary judgment. (Docket #24). This motion has been fully briefed, and, for the reasons explained below, Defendants' motion for summary judgment will be granted. The Court will also address Plaintiff's pending motion for an extension of time to file a response to proposed findings of fact, (Docket #34), as well as Defendants' pending motion for an extension of time to respond to Plaintiff's proposed findings of fact pending the Court's decision on Plaintiff's motion for an extension, (Docket #40).

1.     **STANDARD OF REVIEW**

    Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). Internal inconsistencies in a witness's testimony "create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170 (7th Cir. 1996) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)). The non-movant "need not match the movant witness for witness, nor persuade the court that [its] case is convincing, [it] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

2. **FACTUAL BACKGROUND**

    2.1 **Plaintiff's Failure to Dispute Defendants' Proposed Facts**

The relevant facts are undisputed because Plaintiff failed to dispute them. In the Court's scheduling order, entered October 24, 2019, Plaintiff was warned about the requirements for opposing a motion for summary judgment. (Docket #15 at 3). Accompanying that order were copies of

Page 2 of 20
Case 2:19-cv-00456-JPS   Filed 03/05/21   Page 2 of 20   Document 43

Federal Rule of Civil Procedure 56 and Civil Local Rule 56, both of which describe in detail the form and contents of a proper summary judgment submission. In Defendants' motion for summary judgment, they further warned Plaintiff about the requirements for his response as set forth in Federal and Local Rules 56 and also provided him with copies of those Rules. (Docket #24 at 1, 3–11).

In connection with their motion, Defendants filed a supporting statement of material facts that complied with the applicable procedural rules. (Docket #26). It contained short, numbered paragraphs concisely stating those facts they proposed to be beyond dispute, with supporting citations to the attached evidentiary materials. (*Id.*)

As the party opposing Defendants' motion, Plaintiff was required to file "a concise response to the moving part[ies'] statement of facts" containing "a reproduction of each numbered paragraph in the moving part[ies'] statement of facts followed by a response to each paragraph, including, in the case of any disagreement, specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon[.]" Civ. L.R. 56(b)(2)(B).

Plaintiff failed to do this. On July 24, 2020, Plaintiff filed his own affidavit with attached exhibits (totaling 82 pages) to support his brief in opposition, (Docket #32; #32-1), but he did not provide a response to Defendants' proposed facts. On August 6, 2020, Defendants filed a short reply brief, which stated that Plaintiff had failed to respond to Defendants' proposed findings of fact and that Plaintiff did not submit his own proposed findings of fact that comply with Civ. L.R. 56(b)(2). (Docket #33 at 1). On August 17, 2020, seemingly in response to Defendants' reply brief, Plaintiff filed a motion for an extension of time to file a response to

Defendants' proposed findings of fact and to file his own proposed findings of fact. (Docket #34). Plaintiff stated that he needed this extra time due to the COVID-19 pandemic, which limited his library time to respond to Defendants' motion for summary judgment. However, during that same time period, Plaintiff was able to draft a 20-page brief in opposition, 15-page affidavit, and attach 62 pages of exhibits. Further, Plaintiff's complaint that underlies this entire case is based on his knowledge that he must comply with court deadlines and in accordance with the local rules. Plaintiff did not ask for more time when he filed his brief in opposition—he only asked for more time after his error was pointed out in Defendants' reply brief. In sum, the Court finds Plaintiff's excuse unpersuasive and will deny his motion for an extension of time, (Docket #34), and, accordingly, will deny Defendants' related motion for an extension of time as moot. (Docket #40).

Plaintiff failed to respond to Defendants' proposed findings of fact. The effect of this failure is that, for the purpose of deciding summary judgment, Defendants' uncontroverted statements of material fact are deemed admitted. *See* Fed. R. Civ. P. 56(e); Civ. L.R. 56(b)(4); *see also Fabriko Acquisition Corp. v. Prokos*, 536 F.3d 605, 607–08 (7th Cir. 2008) ("[A] district court is entitled to demand strict compliance with [the local] rules for responding to a motion for summary judgment, and . . . a court does not abuse its discretion when it opts to disregard facts presented in a manner inconsistent with the rules.") (citation omitted); *Hill v. Thalacker*, 210 F. App'x 513, 515 (7th Cir. 2006) (noting that district courts have discretion to enforce procedural rules against *pro se* litigants).

Though the Court is required to liberally construe a *pro se* plaintiff's filings, it cannot act as his lawyer, and it cannot delve through the record to find favorable evidence for him. Thus, the Court will consider Plaintiff's

affidavit and exhibits, (Docket #32; #32-1), only to the extent they do not contradict Defendants' uncontroverted proposed facts, (Docket #26).

### 2.2 Relevant Facts[1]

Plaintiff was incarcerated at Dodge Correctional Institution ("DCI") during the relevant events. Defendants Tammy DeVries ("DeVries") and Michael Bernstein ("Bernstein") are librarians at DCI, collectively ("Librarians"). They operate the library and law library, and, among other things,[2] help inmates with various requests, including assistance with e-filing, photocopies, notary services, law library passes, library passes, case law, and other miscellaneous questions. Defendant Brian Greff ("Greff") was the Program Supervisor at DCI from April 3, 2016 to October 27, 2018. Greff's responsibilities[3] included supervising the Librarians and implementing any corrective action that may be needed with them.

In early 2017, the Library Services and Education Technology Coordinator ("LSET Coordinator") visited DCI and noticed what the library was offering in paperback. He informed staff that they were offering more than what was necessary. Under the Division of Adult Institutions ("DAI") Policy 309.15.01, the Wisconsin Jury Instructions were an unnecessary

---

[1] All facts are drawn from Defendants' proposed findings of fact, (Docket #26), unless otherwise noted.

[2] The Librarians' responsibilities included developing and maintaining book and other material collections, providing reference services, and providing other miscellaneous services to inmates. (Docket #26 at 2).

[3] "Greff was responsible for all activities within his units, including the coordination of all disciplines to address and monitor inmate activities and well-being, supervision and direction of assigned unit staff, and facilitation and evaluation of unit-based work assignment, and managing unit-based services provided to inmates. Greff was tasked with the development, implementation and monitoring of overall institution goals, policies, and procedures as part of the institution management team." (Docket #26 at 2).

document. Also around this time, one of the Librarians informed Greff that some of the non-essential materials either had pages missing, were worn out, or were outdated and inquired as to replacing them. DeVries and Bernstein recall that the copy of the Wisconsin Jury Instructions available at this time was both outdated and missing pages. After speaking with the LSET Coordinator, Greff asked DeVries and Bernstein to remove the paperback documents that were not required to be offered, so that DCI no longer had to purchase or replace unnecessary documents. In the late spring or early summer of 2017, unnecessary outdated paperback references–including the Wisconsin Jury Instructions–were removed from the library.

The DCI library and law library's hours are Monday through Friday from 7:00 a.m. to 3:30 p.m. Both libraries are also open on Monday evenings from 6:00 p.m. to 8:00 p.m., but the Librarians are not present, and instead the libraries are run by an officer who is unable to provide services such as e-filing and photocopying. Inmates who wish to use the law library must send in a written request. The Librarians put the inmate on the schedule and a pass is created for them with a time to come to the law library for a one-hour session. A pass sheet is posted to each unit for the upcoming day, so inmates know in advance what passes they have. As this pass sheet includes law library passes, an inmate will know if they are on the schedule for a law library pass the day before, or they can check the list after the 6:30 a.m. count (before the law library is open).

Each day, the Librarians accommodate approximately 150-175 inmates in the library and 50-60 inmates in the law library, and receive approximately 300 written requests from inmates, including requests for e-filing, photocopies, notary services, law library passes, library passes, case

Page 6 of 20
Case 2:19-cv-00456-JPS   Filed 03/05/21   Page 6 of 20   Document 43

law, and other miscellaneous questions. When an inmate brings work to be photocopied or e-filed, staff do their best to ensure the work is completed the same day. If they are unable to complete the work the same day, it is done first thing the next morning. All inmates are responsible for keeping track of their own legal deadlines. Law library staff are not responsible if an inmate does not complete his work in a timely manner.

On November 5, 2017, Plaintiff filed an inmate complaint in which he claimed that DeVries and Bernstein failed to timely file documents for his lawsuit against the Milwaukee County Jail. The inmate complaint examiner ("ICE") received the complaint on November 9, 2017, and the same day she returned the complaint to Plaintiff, instructing him to resolve his issue with Program Supervisor Greff before filing a complaint. Pursuant to Wis. Admin. Code § DOC 310.16, inmate complaints are confidential. The ICE did not discuss this returned complaint submission with anyone. The Librarians were not aware of the inmate complaint made against them. Plaintiff did not resubmit this inmate complaint, so it was never processed through the inmate complaint review system.[4]

On November 17, 2017, Plaintiff sent an information request and letter to Greff in which he complained that the Librarians failed to file his legal paperwork on time. In this letter, Plaintiff alleged that on November 6, 2017, he tried to explain to the Librarians how he needed his documents copied and e-filed, but he was not able finish explaining what he needed before he had to leave the law library for the 12:15 p.m. count. (Docket #28-

---

[4]There appears to be an issue of whether Plaintiff properly exhausted his administrative remedies. However, because Defendants did not argue this issue, the Court will presume that Plaintiff properly exhausted his administrative remedies before filing this lawsuit.

1 at 3). Plaintiff attempted to get called back to the law library to finish explaining how the documents needed to be e-filed, but he was never called back. (*Id.*) The Librarians e-filed Plaintiff's legal documents "without me even completely explaining how it was supposed to be done." (*Id.*) On November, 7, 2017, Plaintiff received his e-filed documents via institution mail and he noticed that his exhibits were not marked and were out of order. (*Id.*) "Through U.S. District Court's instructions, I have an obligation to mark my exhibits and place them in the correct order. I had to re-E-File this document. In the future the court may not be lenient with me for missing my deadlines, I have been warned." (*Id.*)

Greff does not recall what he did about the letter, but he likely would have stopped by the library or called and asked what happened. Greff does remember that the documents were accepted by the court and were not late. The Librarians do not have a specific recollection of Greff speaking with them regarding a letter from Plaintiff. On November 20, 2017, Greff responded to Plaintiff's letter, stating, "It is unfortunate that you were inconvenienced. The staff try to accommodate the needs of over 1600 inmates and their use of the library and Law Library." Plaintiff was unhappy with Greff's response.

The library staff noticed a pattern in which Plaintiff would bring larger quantities of work to be copied and e-filed within the last hour of the library being open. Plaintiff had also previously asked his unit officer to call the library to request that he get something e-filed, but when Plaintiff arrived, he would have additional requests that would occupy DeVries and Bernstein's time. In December 2017, the Librarians decided to change some of Plaintiff's law library passes to morning sessions in order to accommodate his workload. By changing some of the pass times to the

morning, Plaintiff and library staff could ensure his work would be completed in a timely manner. But, before changing Plaintiff's law library passes to morning sessions, DeVries called Plaintiff's unit officer and confirmed that Plaintiff would be able to come down to the law library in the morning. Plaintiff's law library passes were changed in an effort to help him, not punish him or prevent him from having access to the law library, and the passes were not changed because of Plaintiff's letter to Greff.

On December 1, 2017, Plaintiff was issued a law library pass for 7:30 a.m., and he did not attend. On December 7, 2017, Plaintiff arrived for his 9:30 a.m. library session and asked DeVries and Bernstein why his passes had been changed from afternoons to mornings. Plaintiff was informed that his passes were changed to accommodate his workload and ensure his work could be completed in a timely manner. Plaintiff became upset, loud, and disruptive to other inmates, so he had to be removed from the library by an officer.

Between November 5, 2017 and January 18, 2018, Plaintiff was issued 33 passes to the law library. Of these 33 passes, 14 were scheduled for a morning session. Plaintiff did not attend four of these 33 law library sessions—two scheduled in the morning and two for the afternoon. In addition to attending the law library, Plaintiff went to the general library in both the mornings and afternoons during this same time period. (Docket #29-2 at 1).

On December 17, 2017, Greff received an information request from Plaintiff in which he asked Greff to stop DeVries from throwing away the Wisconsin Jury Instructions and complained about being adversely treated by the Librarians since he complained to the ICE and Greff about the Librarians mishandling his legal materials. DeVries and Bernstein do not

Page 9 of 20
Case 2:19-cv-00456-JPS   Filed 03/05/21   Page 9 of 20   Document 43

recall Plaintiff requesting a copy of the Wisconsin Jury Instructions. However, if an inmate requests something that is not required for the law library to provide, it is their general practice to inform the inmate that the law library is not required to provide the requested document pursuant to DAI Policy 309.15.01, but a friend or family member could mail the inmate a copy. On December 28, 2017, Greff responded to Plaintiff, stating, "Nothing was thrown away. The Law Library continues to offer what is required by policy. Please specify the adverse treatment you have received." There is no record of Plaintiff responding to Greff with information regarding the "adverse treatment" he was receiving.

When Plaintiff arrived at DCI in 2012, he received an initial classification of maximum custody, with programming needs identified for AODA Residential, Cognitive Intervention, Anger Management, and Vocational Education. After their initial classification, all inmates are reclassified at 12-month intervals. Plaintiff was placed at DCI, which is a maximum-security facility. Plaintiff is currently serving his fourth incarceration. His current offenses include convictions of 1st Degree Recklessly Endangering Safety, Felon in Possession of a Firearm, and 1st Degree Reckless Homicide.

On January 18, 2018, Plaintiff had his Program Review Committee ("PRC") hearing for a scheduled review. Sometime before Plaintiff's hearing, a DCI Offender Classification Specialist was informed that the Wisconsin Secure Program Facility ("WSPF"), a maximum-security facility, had recently converted a restrictive housing building to general population and was in need of inmates to fill the unit.

At the time of the January 18, 2018 review, Plaintiff had served over five years since his admission and had 30 years remaining until becoming

eligible for release on Extended Supervision. As part of the annual re-classification process, an inmate's custody, placement and program or treatment needs are reevaluated and adjusted based upon changes occurring during their incarceration. Greff was one of three members on the re-classification committee. He usually does not serve on the re-classification committee. He was on the committee for Plaintiff's January 18, 2018 hearing because he is the back-up for the Social Services Director, who was out that day. The two other committee members that day are not defendants in this case.

At his Program Review hearing, Plaintiff requested a reduction in custody and to stay at DCI because he had maintained good conduct. The committee noted that Plaintiff had greatly improved his conduct since 2013 and was maintaining positive work placements. They discussed with Plaintiff the possibility of going to WSPF based on the institution's resources. There are several resources available at WPSF that are not available at DCI. For example, WSPF has an education department with basic education and vocational programs, but DCI does not. WSPF also offers anger management, thinking for a change, and domestic violence programs. The committee agreed that Plaintiff would benefit from the resources available at WSPF, and WSPF was looking to fill beds in general population.

Plaintiff argued with the committee and stated that he wanted to stay at DCI because it is a "privileged" institution and he hadn't don't anything to deserve going to WSPF. He noted that WSPF was further away from his family, and that he believed the move to WSPF was because he was "asserting his rights in the law library." The committee explained to Plaintiff that a move to WSPF was not being recommended as a punishment

for any conduct. Instead, he was being recommended to go to WSPF in general population, because the committee agreed that he could benefit from resources available for him there. Despite the committee's explanations, Plaintiff had a hard time understanding that the referral to WSPF was not based on his conduct and that it was not done to punish him.

The committee unanimously recommended that Plaintiff continue at maximum custody with a transfer to WSPF. It was determined that Plaintiff remained appropriate for maximum custody based on the seriousness of his offense, as it involved loss of life and two additional victims had suffered gunshot wounds. The committee also determined he was appropriate for maximum custody due to his time served versus overall sentence structure. Additionally, the committee agreed that Plaintiff would benefit from the resources available at WSPF, which were not available at DCI, and WSPF was looking to fill beds in general population.

The committee's recommendation is only a recommendation, and no one committee member's opinion means more than the others. The committee recommended Plaintiff and one other inmate for transfer to WSPF on January 18, 2018. As a form of checks and balances, the recommendation goes on to an "approver," in this case, The Bureau of Offender Classification and Management Sector Chief, Daisy Chase, for approval. The inmate also has the ability to appeal the approval if he disagrees with it. Greff has no part in the approval or the appeal. Plaintiff was approved to transfer to WSPF on January 31, 2018 and was officially transferred on February 5, 2018.

### 3. ANALYSIS

Plaintiff was permitted to proceed on a claim of retaliation in violation of the First Amendment against Defendants Bernstein, DeVries,

Page 12 of 20
Case 2:19-cv-00456-JPS    Filed 03/05/21    Page 12 of 20    Document 43

and Greff. The claim is based on Plaintiff's complaint/letter to Greff on November 17, 2017 about DeVries and Bernstein, which Plaintiff alleges motivated retaliatory action by all Defendants.

First Amendment retaliation cases require the plaintiff to show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). If those elements are established, the burden shifts to the defendant to rebut the claim by showing that the activity would have occurred regardless of the protected activity. *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). If the defendant meets his/her burden, then the burden shifts back to the plaintiff, who must demonstrate that the proffered reason is pretextual or dishonest and that the real reason was retaliatory animus. *Id.* at 969.

### 3.1 Activity Protected by First Amendment

Defendants concede that Plaintiff's inmate complaint and/or letter to Greff is a First Amendment protected activity and satisfies the first element of the retaliation claim. (Docket #25 at 7). The Court agrees that Plaintiff's complaint/letter fall within the First Amendment's protections and Plaintiff has satisfied the first element. *Watkins v. Kasper*, 599 F.3d 791, 798 (7th Cir. 2010)("A prisoner has a First Amendment right to make grievances about conditions of confinement."). The Court next address the second element—whether Plaintiff suffered a deprivation that would likely deter First Amendment activity in the future.

### 3.2 Deprivation that Would Likely Deter First Amend. Activity

Plaintiff alleges that because he filed a grievance against DeVries and Bernstein, he suffered retaliation in the following ways: first, that DeVries and Bernstein changed Plaintiff's law library passes to "unfavorable times," meaning the morning instead of the afternoon; second, that DeVries and Bernstein removed the jury instructions from the law library to stop inmates from using it; and third, that he was transferred to a "worse" maximum-security prison that was further away from his family. (Docket #31 at 9–10). Defendants argue that Plaintiff did not suffer any depravations that would likely deter First Amendment activity, that Defendants' actions were taken for legitimate reasons, and that Defendants' actions were not motivated by the complaint/letter. (Docket #25 at 5).

Whether retaliatory conduct is sufficiently severe to deter is generally a question of fact, but when the asserted injury is truly minimal, we can resolve the issue as a matter of law. *Douglas v. Reeves*, 964 F.3d 643, 647 (7th Cir. 2020); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise...."). "We apply an objective test: whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity." *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011).

#### 3.2.1 Library Passes

Plaintiff alleges that DeVries and Bernstein changed his library pass time from afternoons to mornings in retaliation for Plaintiff's complaint to Greff about them. Defendants argue that the change was made so they could better accommodate Plaintiff's needs in the library—not in retaliation

for any complaint against them. Additionally, Defendants state that no deprivation occurred because the change in some of Plaintiff's library passes did not prevent him from accessing the library.

Although Plaintiff asserts that he never attended the law library in the morning before the actions of Defendants, this statement is contradicted by the library pass log. (Docket #29-2). For example, months prior to the alleged incident, between February 21, 2017 and August 29, 2017, Plaintiff was issued a law library pass for 8:30 a.m. 16 times—he did not show up four times. (*Id.* at 2). During this same time period, Plaintiff did not show up eight times for his afternoon law library pass. (*Id.*)

Further, Plaintiff's argument that he suffered a deprivation that would likely deter First Amendment activity in the future when DeVries and Bernstein "only" scheduled him morning law library passes is demonstrably false. Plaintiff was actually provided more afternoon law library passes between December 1, 2017 and January 8, 2018 than morning passes. Plaintiff was not denied access to the law library by Defendants' actions. Although he would have preferred to attend the library in the afternoon, he was still able to attend in the morning and he did in fact attend the morning sessions. He did not show up for his library sessions four times, twice for morning sessions and twice for afternoon sessions. Plaintiff has not supplied any evidence that he suffered a deprivation when some of his law library passes were scheduled for the morning. Therefore, because he was able to attend the law library with the same frequency as he was before the alleged retaliation began, he has *not* suffered a deprivation likely to deter protected speech.

### 3.2.2 Jury Instructions

Plaintiff alleges that Defendants removed jury instructions from the library in retaliation for his complaint against DeVries and Bernstein. Defendants argue that the removal of the Wisconsin Jury Instructions was done months before Plaintiff's letter was submitted and that Plaintiff's complaint had nothing to do with why the item was removed. Specifically, the Wisconsin Jury Instructions, along with other documents that were not required to be offered in the library, were removed in the spring/summer of 2017. Plaintiff filed his letter to Greff on November 17, 2017. Based on the chronology, the removal could not have been in retaliation. Thus, Plaintiff has failed to establish that the removal of the Wisconsin Jury Instructions was sufficiently adverse to support a retaliation claim.

### 3.2.3 Transfer to WSPF

Plaintiff alleges he was transferred from DCI to WSPF in retaliation for his November 17, 2017 letter complaining to Greff about DeVries and Bernstein. Defendants argue that Plaintiff's complaint had nothing to do with the transfer to WSPF. Instead, the recommendation was made because WSPF could better meet Plaintiff's program needs, and it had new general population beds to fill.

The Seventh Circuit explained in *Holleman v. Zatecky*, 951 F.3d 873, 881 (7th Cir. 2020), that a transfer "from the general population of one maximum-security facility to the general population of another maximum-security facility," on its own, is not sufficiently adverse for a retaliation claim. The plaintiff in *Holleman* argued that he had a contentious history with the defendants, and that his transfer to a different prison was in retaliation for his complaints about the conditions of the prison and medical care. *Id.* at 879. The plaintiff did not believe that a transfer would help

resolve his complaints, and "the [d]efendants were entitled to disagree." *Id.* at 880. The Seventh Circuit held that the plaintiff's arguments "fail[ed] to overcome the significant deference owed to the defendant's non-retaliatory justification for the transfer." *Id.* at 880. "[W]e owe deference to prison officials' decisions when responding to grievances and maintaining order in a volatile environment, and to the justifications offered for those decisions." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996)).

Additionally, because the plaintiff was not transferred into a more restrictive or dangerous environment, the Seventh Circuit held that the plaintiff failed to establish that his transfer was adverse. *Holleman*, 951 F.3d at 881. Specifically, the Seventh Circuit stated that,

> [T]he disruption inherent in a transfer to a different facility does not by itself make the transfer adverse. Without some additional aggravating factor, such as relocation to a much more restrictive or dangerous environment, a transfer is not likely to deter a person of ordinary firmness from continuing to engage in protected conduct.

*Id.* at 882.

Like the plaintiff in *Holleman*, Plaintiff was transferred from a maximum-security prison to another maximum-security prison. Plaintiff was not transferred into a more restrictive or dangerous environment. In fact, the committee stated that Plaintiff was being transferred so that he could participate in programs that DCI did not have. "A transfer that objectively improves the prisoner's condition, for example, would not deter a person of ordinary firmness from engaging in protected activity." *Id.* at 881. Although Plaintiff disagreed with the transfer decision, that does not mean the action was sufficiently adverse to deter First Amendment activity.

Therefore, Plaintiff has failed to show that the transfer to WSPF was sufficiently adverse to maintain a retaliation claim.

### 3.3 First Amendment Activity was a Motivating Factor

The Court finds that Plaintiff did not suffer a deprivation that would likely deter First Amendment activity in the future from any of the actions detailed above. However, even if Plaintiff did suffer a deprivation, the Court finds that Plaintiff's complaint to Greff regarding DeVries and Bernstein was not a motivating factor in changing the law library pass times, removing the Wisconsin Jury Instructions, or recommending a transfer to WSPF. The three instances of "retaliation" which Plaintiff complains would have occurred regardless of his November 17, 2017 letter, and they are supported by legitimate reasons. *See Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011); *Brown v. Phillips*, 801 F.3d 849, 855 (7th Cir. 2015).

Specifically, the library pass times were changed so that the Librarians could complete Plaintiff's requests in a timely manner, and DeVries verified that Plaintiff could attend morning sessions before changing his law library pass for the first time. Next, the Wisconsin Jury Instructions were removed—along with other outdated resources that were not required by policy—so that DCI did not have to incur the time and cost of replacing them. Additionally, the Wisconsin Jury Instructions were removed months before Plaintiff filed his complaint. Lastly, the transfer to WSPF was to benefit Plaintiff due to the resources available at WSPF, and to fill beds in a new general population unit recently completed there. Further, Greff stated that he did not even consider the fact that Plaintiff had complained when he was making his recommendation.

In sum, Defendants have met their burden to establish that the three actions Plaintiff alleges were retaliatory–jury instruction removal, library

Page 18 of 20
Case 2:19-cv-00456-JPS   Filed 03/05/21   Page 18 of 20   Document 43

pass time change, and transfer to WSPF–would have occurred regardless of Plaintiff's protected activity. The burden now switches to Plaintiff to demonstrate that Defendants' reasons are pretextual or dishonest. However, Plaintiff has not provided any evidence beyond speculation that Defendants' proffered reasoning is merely pretextual. Further, the evidence contradicts Plaintiff's allegations of retaliation and animus. The Court finds that Plaintiff has failed to meet his burden necessary to maintain a retaliation claim. Therefore, the Court will grant Defendants' motion for summary judgment and dismiss the case with prejudice.

### 4. CONCLUSION

For the reasons explained above, Defendants' motion for summary judgment, (Docket #24), will be granted and the case dismissed with prejudice. Additionally, the Court will deny Plaintiff's motion for an extension of time, (Docket #34), and, accordingly, will deny Defendants' related motion for an extension of time as moot, (Docket #40).

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Docket #24) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for an extension of time (Docket #34) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendants' motion for an extension of time (Docket #40) be and the same is hereby **DENIED as moot**; and

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 5th day of March, 2021.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge